Joseph Shapiro (277111)
Michael Stanger (*pro hac vice pending*)
STRONG & HANNI, P.C.
102 S 200 E, Suite 800
Salt Lake City, UT 84111
Telephone: (801) 532-7080
jshapiro@strongandhanni.com
mstanger@strongandhanni.com

*Attorneys for Plaintiff International Technological University Foundation*

---

## IN THE UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL TECHNOLOGICAL UNIVERSITY FOUNDATION, a California corporation<br><br>Plaintiff,<br><br>vs.<br><br>WASC SENIOR COLLEGE AND UNIVERSITY COMMISSION, a corporation; SOFIA UNIVERSITY, SPC, a corporation; GREG O'BRIEN, an individual, BARRY RYAN, an individual; and DOES 1-10,<br><br>Defendants. | **Case No.: 5:22-cv-4576**<br><br>**Judge:**<br><br><br><br>**COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff International Technological University Foundation ("Plaintiff" or "ITU") hereby complains against Defendants WASC Senior College and University Commission ("WSCUC"), Sofia University, Greg O'Brien ("O'Brien"), and Barry Ryan ("Ryan") as follows:

**THE PARTIES**

1.      Plaintiff ITU is a California corporation with a principal place of business in Santa Clara, County of Santa Clara, California.

2.      WSCUC is a California corporation a principal place of business in Alameda, California, County of Alameda, California.

3.      Sofia University, SPC is a California corporation with a principal place of business in Palo Alto, California.

4.      Greg O'Brien is an individual who is believed to reside in St. Johns County, FL.

5.      Barry Ryan is an individual who is believed to reside in Orange County, CA.

**JURISDICTION**

6.      This Court has subject-matter jurisdiction under at least 28 U.S.C. §§ 1331 and 1367.

7.      This Court has personal jurisdiction over Defendants under because Defendants reside in California and/or were in California for all or a substantial amount of the facts giving rise to this action.

**VENUE**

8.      Venue is proper in this Court at least under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

**DIVISIONAL ASSIGNMENT**

9.      This case should be assigned to the San Jose Division because a substantial part of the events giving rise to the claims herein occurred in Santa Clara County.

**FACTUAL ALLEGATIONS**

10.      This Complaint is the latest chapter in the ongoing efforts of ITU and its current President and CEO, Yau-Gene Chan, to rebuild ITU into the kind of innovative institution envisioned

COMPLAINT; DEMAND FOR JURY TRIAL

by his father, Dr. Shu-Park Chan ("Dr. Chan") despite the efforts of WSCUC, O'Brien, Ryan and others to exploit and harm ITU for their own benefit.

11.     ITU is a non-profit university founded in 1994 by Dr. Shu-Park Chan as the world's first global network university model.

12.     ITU is focused on providing its students with a high-quality educational experience emphasizing practical instruction in engineering, business, biotech, and media arts. ITU alumni have, as a result, been extraordinarily successful in obtaining high paying jobs with Silicon Valley companies.

13.     ITU was accredited by the Accrediting Council for Independent Colleges and Schools ("ACICS") from July 1, 2001, to December 31, 2004.

14.     Dr. Chan served as President and CEO of ITU from its founding until his retirement in 2010.

15.     Yau-Gene Chan joined ITU in 2005 as Executive Vice President, at no compensation, to assist in advancing the Chan family's vision for ITU.

16.     When Yau-Gene Chan joined ITU in 2005, ITU was on the brink of bankruptcy, with less than two months of cash and only 18 students.

17.     Upon information and belief, Defendant Greg O'Brien ("O'Brien") has historically worked in the education industry as a consultant or in other administrative positions.

18.     Beginning in 2007, "O'Brien" concurrently and separately contracted (either as a contract or as an employee) with three northern-California universities—ITU, Sofia University ("Sofia") and California Northstate University ("CNU")— to provide consulting services on obtaining and retaining accreditation from WSCUC.

19.     At this time in 2007, and continuing to the present, Sofia and CNU were and have been competitors of ITU.

20.     Upon Dr. Chan's 2010 retirement, ITU's Board of Trustees elected his son, Yau-Gene Chan, to be President and CEO of ITU.

21.     On February 22, 2013, ITU attained accreditation status with WSCUC.

22.     By 2014, ITU was rapidly growing in educational quality, student numbers, and student quality.

23.     As the WSCUC-approved consultant, O'Brien advised and convinced ITU to install other WSCUC-affiliated persons to the ITU Board under the auspices of improving ITU's standing with its accrediting body (WSCUC).

24.     But instead of promoting the interests of ITU, this was an apparent scheme to orchestrate a takeover of ITU and its finances.

25.     Even though ITU had used and heavily relied on O'Brien's consulting services and advice, in May 2014 WSCUC determined to deny accreditation to ITU's online program.

26.     As a result of this and other circumstances, ITU did not renew its contract with O'Brien.

27.     Immediately following the decision to not renew O'Brien's contract with ITU, O'Brien became the Chairman of the Board of Trustees at Sofia.

28.     O'Brien and the Sofia Board then appointed Edward Lam ("Lam"), who was employed as CFO of ITU, as CFO of Sofia.

29.     At this time, Lam was concurrently employed as CFO of ITU and as CFO of Sofia.

30.     Because of this significant conflict of interest (Lam simultaneously working as CFO at competing universities), Yau-Gene Chan requested that Lam step down from his role with Sofia, specifically referencing the loss of students from ITU to Sofia.

31.     Communications between Lam and another ITU insider discussed how his getting fired by YGC would be "helpful" with WSCUC.

32.     In December 2014, at the urging of O'Brien, Lam, and other members of the Sofia Board, seven ITU employees (including Lam) submitted to WSCUC a third-party comment alleging significant accreditation non-compliance at ITU, directing the blame at Yau-Gene Chan.

33.     WSCUC responded by scheduling a site visit to ITU for February 6, 2015.

34.     During this February 6, 2015 visit, WSCUC threatened to the ITU Board that WSCUC would withdraw accreditation unless the ITU Board removed Yau-Gene Chan as President.

35.     During this WSCUC visit, O'Brien and Lam advised and urged the ITU Board to appease WSCUC by removing Yau-Gene Chan as President and CEO.

36.     Under extreme pressure from WSCUC and the ITU Board, Yau-Gene Chan stepped down on February 8, 2015, and the ITU Board appointed O'Brien as President[1] of ITU on the same day.

37.     O'Brien immediately requested and received the highest salary ever for ITU CEO—$360,000—plus local California housing (O'Brien was a resident of and lived in Florida during the entire time he was President of ITU and spent significantly more than half his time in Florida), a car, and travel costs between Florida and California.

38.     Upon becoming President, O'Brien also immediately gave pay raises to all ITU employees who had signed the December 2014 third-party comment to WSCUC.

39.     In addition to his salary, O'Brien also demanded and received California housing (he lived in Florida while working as President of ITU), a car, and travel costs to and from Florida.

40.     Mr. O'Brien remained Board chair at Sofia University for at least some of the time he was also President of ITU.

41.     While President of ITU from February 2015 thru October 2019, O'Brien was a resident of Florida, spending only limited time at ITU and requiring ITU to pay for a California residence and vehicle for his use while in California.

---

[1] "President" and "CEO" of ITU are used interchangeably as these have historically been the same position at ITU.

42.     During his first year as President, O'Brien fired over 30 ITU employees, ITU had a 32% drop in student enrollment, and average English test scores and GPAs for incoming students dropped.

43.     Additionally, during O'Brien's first year as President ITU's previously robust cash reserves began to drop precipitously.

44.     Upon becoming President, O'Brien rewarded his close friend Barry Ryan ("Ryan"), who at the time was a WSCUC commissioner, with a "no show" position as ITU's Provost at a salary of $250,000 per year. Like O'Brien, Ryan lived far away from ITU and required ITU to provide housing for his visits to the area.

45.     O'Brien and Ryan promptly hired Micah Thomas as ITU's Executive Director of Marketing & Enrollment Management at a salary of $173,000 per year.

46.     From 2015 through 2018, with under O'Brien at the helm, ITU's enrollment, performance metrics, and financial reserves dropped precipitously.

47.     For example, ITU's annual revenue was $20,000,000 for the fiscal year ending in June of 2015 but was only $7,000,000 for the fiscal year ending in June of 2020.

48.     Notwithstanding these significant red flags, including obvious conflicts of interest, financial mismanagement, and declining student enrollments, in July 2018 WSCUC summarily renewed ITU's accreditation for six years—conspicuously omitting any reference to O'Brien's leadership failures and ITU's failing financial performance.

49.     By October 2019, O'Brien's "leadership" had driven ITU to the brink of ruin. ITU's enrollment had fallen from 1,514 when O'Brien took over in February 2015 to 448 in October 2019. ITU's financial reserves had fallen from $20,000,000 when O'Brien took over in February 2015 to $0 in October 2019.

50.     In one of his final acts as President of ITU, and true to form, O'Brien attempted to orchestrate the wholesale transfer of ITU's remaining 450 students to Sofia University—which would have been a substantial windfall to Sofia in new students and tuition.

51.     And ever mindful of opportunities to skim from ITU, O'Brien "negotiated" a lucrative severance package for himself on the way out the door. Although O'Brien should have been paying ITU to release its claims against O'Brien, O'Brien orchestrated a $90,000 payment from ITU to O'Brien!

52.     O'Brien did not disclose any of his wrongdoing and self-dealing, and fraudulently induced the Board to agree to a severance.

53.     In conjunction with O'Brien's exit, much of the WSCUC-affiliated Board also resigned.

54.     In a last-gasp effort to save ITU from O'Brien's "leadership" and the resulting financial ruin, the remaining ITU Board reinstated Yau-Gene Chan as President.

55.     As the new President taking over a sinking ship financially weighed down by bureaucracy, cronyism, and sinecures, Yau-Gene Chan immediately implemented staff reductions to reign in payroll expenses, and provided a 0% interest personal loan of $300,000 to ITU to help ensure remaining staff would and could be paid.

56.     These staff reductions included elimination of the Barry Ryan's Provost position and elimination of Micah Thomas's position as Executive Director of Marketing & Enrollment Management.

57.     As he embarked on righting the ITU ship, Yau-Gene Chan made several startling discoveries, including but not limited to the following.

        a.   Lam and O'Brien had developed and begun to implement a plan to transfer all or substantially all ITU's students to Sofia.

      b.   Lam and O'Brien had conspired to embezzle millions of dollars from ITU to dummy vendors that were owned, controlled, and/or affiliated with ITU's Chief Technology Officer and another faculty member.

58.    Three days after reinstatement of Yau-Gene Chan as President in October 2019, WSCUC issued an Order to Show cause against ITU and scheduled a special visit.

59.    These WSCUC actions were retaliatory intentionally timed and calculated to harm ITU and to interfere with ITU's efforts to recover from the harm that had been aided and abetted by WSCUC and its insiders.

60.    In a February 26, 2020 Commission Action Letter, WSCUC identified seven areas for ITU to address.

61.    After WSCUC's Visiting Team came to inspect ITU on May 12-14, 2021, WSCUC issued a report regarding ITU's status.

62.    This May 2021 Report applauded ITU's substantial progress in addressing WSCUC's previously identified areas of concern.

63.    In its May 2021 Report, WSCUC noted that ITU had put a great deal of hard work into addressing WSCUC's concerns, and that ITU had dedicated significant energy to rebuilding the university's strength and sustainability. The Report included many positive findings:

      a.   ITU had conducted an informative and productive internal review;

      b.   ITU's had sufficiently response to requests for additional documents;

      c.   ITU had shown acknowledgment of, understanding of, and progress in, areas of concern from the February 26, 2020, Commission Action Letter;

      d.   SEVP (Federal Student Exchange Visitor Program) issues had been generally resolved;

      e.   Human resource concerns had been adequately addressed;

      f.   Documentation of revenues, expenses, and loans had improved;

g.  ITU's website was creative, engaging, and informative;

h.  ITU was exploring market opportunities in innovative new areas such as cybersecurity;

i.  ITU's Board improvement: expansion of Board skillset through the addition of new members; Board training; new by-laws; and establishment of committees;

j.  More than 30 departmental and unit operational plans with key performance indicators had been developed, and staff were meeting regularly to discuss progress;

k.  Despite extraordinary circumstances such as COVID-19 and restrictions imposed by the U.S. government on international students, ITU had dedicated significant efforts to rebuilding its financial strength and self-sustainability including:

   i.  Naming a full-time CFO;

   ii.  Securing a non-repayable Paycheck Protection Program to boost revenue by $1.85 million;

   iii.  Posting a 2020 operating surplus of $474,125—a far cry from the 2019 operating deficit of $8.1 million;

   iv.  Implementing significant expense reductions to reflect the reality of declining revenue;

   v.  Obtaining a $110,000 loan and a $2 million line of credit; and

   vi.  Stopping recent operating deficits; and

   vii.  An expected continuing operating surplus;

l.  Improvement in most if not all core functions since the leadership change in 2019;

m. Commitment to its mission to provide industry-relevant training leading to student graduation and success;

n. Having an engaged faculty and staff committed to ITU's mission and student welfare;

o. Continued emphasis on an industry- and practitioner-focused educational model, including continuous adaption to the Silicon Valley industry; and

p. Inclusion of the entire ITU community, including students, in ITU's self-study.

64. On March 9, 2022, ITU received a letter from WSCUC informing ITU that WSCUC had met on February 25, 2022 and decided to withdraw ITU's accreditation status ("Withdrawal Letter").

65. The Withdrawal Letter suggested that ITU was in violation of WSCUC Criteria for Review 3.4, which requires that the institution be financially stable and have resources sufficient to ensure long-term viability. The Withdrawal Letter faulted ITU for unrealistic enrollment projections. But no baselines were provided that would advise ITU of what objective criteria it had to satisfy.

66. The Withdrawal Letter's criticism of ITU's financial position was particularly astonishing because current ITU's financial condition is significantly (and possibly completely) traceable to O'Brien's regime of financial mismanagement under which, ironically, ITU was allowed to maintain its accreditation status!

67. The following facts illustrate this irony:

a. When O'Brien replaced Yau-Gene Chan as President in February 2015, ITU had $20 million in cash reserves.

b. O'Brien's administration managed to deplete cash reserves by $4.6 million—to $15.4 million within five months after O'Brien took over.

    c.   For the fiscal years ending June 30, 2016, 2017, and 2018, under the leadership of O'Brien, ITU posted net losses of $1.7, $1.5, and $4.2 million, respectively. Over the same period, enrollment declined by 45%.

    d.   Notwithstanding these significant financial losses and enrollment decline, on July 20, 2018, WSCUC extended ITU's accreditation for six years. By this date, ITU's cash balance had dropped from $20 million to $6.9 million, and enrollment had dropped from 1,514 in February 2015 to 539 in July 2018.

    e.   Unfortunately, this was not the end of the bleeding, but was instead a harbinger of the bleeding-turned-gushing: In the fiscal year ending June 30, 2019, ITU—still under O'Brien's leadership—posted a loss of over $8 million dollars.

    f.   When O'Brien was removed as CEO on June 30, 2019 ITU's cash balance was down to just $2 million.

    g.   During O'Brien's tenure, ITU lost more than $18 million and its enrollment dropped by 73%.

    h.   When Yau-Gene Chan was reinstated as President, ITU lacked sufficient funds to make payroll.

68.    The Withdrawal Letter's financial criticism of ITU continued by noting that, while progress had been made "in lowering overall expenses, these cost reductions were generated by eliminating staff positions and reducing key leadership capacity."

69.    But this was an inaccurate characterization. Although some cost savings had resulted from eliminating the Provost and Enrollment/Marketing Director positions, the largest savings achieved by Yau-Gene Chan was the elimination of over $16 million in contractual payment

obligations through a negotiated release from a long-term lease that ITU could not possibly perform under given COVID restrictions.

70.     The Withdrawal Letter did not provide any specific suggestions or guidance for ITU to lower expenses. ITU, was left at a loss as to how to appease WSCUC to maintain accreditation.

71.     The Withdrawal Letter also criticized ITU's enrollment management plans, calling them "unrealistic" and stating that they do not represent a stable future or diversification of revenue sources."

72.     Because WSCUC has never provided specific benchmarks or other objective criteria ITU must meet to render its enrollment plan "realistic," ITU has been provided no understanding of how it can address this subjective and conclusory contention by WSCUC.

73.     The Withdrawal Letter also criticized ITU for its failure to "provide evidence of integrated planning between resource allocation and educational objectives."

74.     But ITU has regularly updated and submitted copies of its Strategic Plan, Assessment Plan, Enrollment Plan, and Budgets in its reports to WSCUC. These plans and budgets represent "integrated planning between resource allocation and educational objectives."

75.     To date, WSCUC has not articulated any objective requirement that ITU can achieve or implement to demonstrate that it performs "integrated planning between resource allocation and educational objectives," leaving ITU at a loss for determining how it is supposed to demonstrate compliance with this vague requirement.

76.     The Withdrawal Letter also suggests that ITU is out of compliance with Criteria for Review 3.8, which requires that "the institution have a full-time chief executive officer and a chief financial officer whose primary or full-time responsibilities are to the institution," noting that ITU "has undergone significant and continuing changes in leadership during the last six years."

77.     But ITU has a full-time CEO and CFO

78.     And some of the leadership changes, including elimination of the Provost position and the Executive Director of Marketing & Enrollment Management position, were necessary for survival in the wake of O'Brien's financial evisceration of ITU.

79.     To date, WSCUC has not articulated any objective requirement that ITU can achieve or implement to address this concern, leaving ITU at a loss for determining how to demonstrate compliance with this vague requirement.

80.     The Withdrawal Letter also accused ITU of potentially being in violation of Criteria for Review 4.6, which requires that "[t]he institution periodically engages its multiple constituencies, including the governing board, faculty, staff, and others, in institutional reflection and planning processes that are based on the examination of data and evidence."

81.     In particular, the Withdrawal Letter concluded that ITU "does not have integrated planning processes based on the examination of evidence that would lead to the formation of a realistic strategic position."

82.     But ITU has regularly updated and submitted its Strategic Plan, Assessment Plan, Enrollment Plan, and Budgets to ITU, which plans and budgets evidence and are products of an integrated planning process based on the examination of evidence that would lead to the formation of a realistic strategic position.

83.     To date, WSCUC has not articulated any objective requirement that ITU can achieve or implement address this concern, or informed ITU what would constitute an "integrated planning process" in their opinion, other than the production of strategic plans, assessment plans, enrollment plans, and budgets," leaving ITU at a loss for determining how to demonstrate compliance with this vague requirement.

84.     On April 8, 2022, ITU appealed WSCUC's decision to withdraw accreditation, with large portions of the appeal dedicated to requesting specific objective criteria for ITU to satisfy to maintain its accreditation.

COMPLAINT; DEMAND FOR JURY TRIAL

**FIRST CAUSE OF ACTION**
**Liability for Trade Secret Misappropriation under 18 U.S.C. §§ 1836, 1839**
**(O'Brien, Ryan, Sofia University, Does 1-10)**

85.     ITU incorporates all preceding allegations by reference.

86.     ITU has numerous trade secrets, including but not limited to student lists, potential student lists, contact information for students, contact information for potential students, admissions strategies, and marketing strategies ("ITU Trade Secrets").

87.     ITU has taken reasonable measures to keep the ITU Trade Secrets secret.

88.     The ITU Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

89.     For example, the ITU Trade Secrets would, if known by others, allow others to compete with ITU's business model in advertising to, identifying, attracting, and providing educational services to a specific type of student, namely international students seeking career opportunities in Silicon Valley.

90.     While he was President of ITU, O'Brien disclosed ITU Trade Secrets to Sofia University, or to individuals who passed the ITU Trade Secrets to Sofia University, to assist Sofia University with competing with ITU and stealing students from ITU.

91.     O'Brien acquired the ITU Trade Secrets as either President of ITU, an employee of ITU, or a contractor for ITU.

92.     These circumstances gave rise to a duty for O'Brien to maintain the secrecy of the ITU Trade Secrets.

93.     While he was Provost of ITU, Ryan disclosed ITU Trade Secrets to Sofia University, or to individuals who passed the ITU Trade Secrets to Sofia University, to assist Sofia University with competing with ITU and stealing students from ITU.

94.     Ryan acquired the ITU Trade Secrets as either Provost of ITU, an employee of ITU, or a contractor for ITU.

95.     These circumstances gave rise to a duty for Ryan to maintain the secrecy of the ITU Trade Secrets.

96.     Does 1-10 were either employees/personnel of ITU and/or Sofia University who had access to ITU's Trade Secrets and misappropriated those trade secrets to and for the benefit of Sofia University.

97.     At the time the ITU Trade Secrets were disclosed to Sofia University, Sofia University knew or had reason to know that the ITU Trade Secrets were derived from or through O'Brien, Ryan, and/or others who owed a duty to ITU to maintain the secrecy of the ITU Trade Secrets.

98.     Sofia University knew of O'Brien's duties to maintain the secrecy of the ITU Trade Secrets at least because O'Brien was chairman of Sofia University and O'Brien's close associates held high and senior positions at Sofia University.

99.     Sofia University knew of Ryan's duties to maintain the secrecy of the ITU Trade Secrets at least because Ryan was President of Sofia University and Ryan's close associates held high and senior positions at Sofia University.

100.     Sofia University used the ITU Trade Secrets at least to pursue ITU's students and potential students.

101.     Both ITU and Sofia University provide education services to students from all over the United States and from all over the world—most of ITU's students have been and are international.

102.     O'Brien's, Ryan, and Sofia University's misappropriation of ITU's Trade Secrets have significantly harmed ITU's ability to attract and keep students, which has thereby compromised ITU's financial situation.

103.    The Court should order O'Brien, Ryan, and Sofia University to return all ITU Trade Secrets to ITU, delete any records of ITU Trade Secrets, and cease use of any ITU Trade Secrets or information derived from or traceable to ITU Trade Secrets or use of ITU Trade Secrets.

104.    The Court should award damages for actual loss resulting to ITU from misappropriation of the ITU Trade Secrets; damages for unjust enrichment not addressed in computing actual damages.

105.    Because O'Brien, Ryan, their associates, and Sofia University misappropriated ITU's Trade Secrets willfully and maliciously—in an attempt to eviscerate ITU and gain by redirecting ITU's students and potential students to Sofia University—the Court should award two times the amount of actual damages awarded.

## SECOND CAUSE OF ACTION
### RICO – Trade Secret Misappropriation under 18 U.S.C. §§ 1961, 1962, 1964
### (O'Brien, Ryan, Does 1-10)

106.    ITU incorporates all preceding allegations by reference.

107.    O'Brien, Ryan, and Does 1-10 engaged in numerous acts of trade secret appropriation, including but not limited to misappropriation of different aspects of the ITU Trade Secrets on different dates over a period beginning in or around 2015 (or possibly earlier) and continuing into 2019 or possibly later.

108.    O'Brien, Ryan, and Does 1-10 repeatedly misappropriated ITU Trade Secrets from ITU as part of an ongoing enterprise to promote Sofia University's financial progress to the detriment of ITU.

109.    This pattern of misappropriation led to an increase in O'Brien's, and Ryan's, and Does 1-10s' control over Sofia University.

110.    O'Brien, Ryan, and Does 1-10 promoted Sofia University's affairs through their pattern of trade secret misappropriation.

111.    ITU has been significantly damaged by O'Brien's, Ryan's, and Does 1-10s' pattern of trade secret misappropriation.

112.    The Court should award to ITU treble damages and the cost of this litigation, including reasonable attorney fees.

### THIRD CAUSE OF ACTION
### RICO – Wire Fraud under 18 U.S.C. §§ 1961, 1962, 1964
### (O'Brien, Ryan, Does 1-10)

113.    ITU incorporates all preceding allegations by reference.

114.    O'Brien, Ryan, and Does 1-10 engaged in numerous acts of wire fraud by transmitting to others, including but not limited to employees, Board members, and other personnel associated with ITU and/or WSCUC, numerous email, text, and other communications comprising false representations and pretenses relating to ITU and their efforts to plunder ITU to benefit themselves and Sofia University.

115.    O'Brien, Ryan, and Does 1-10 made these transmissions on different dates over a period beginning in or around 2015 (or possibly earlier) and continuing into 2019 or possibly later.

116.    O'Brien, Ryan, and Does 1-10 repeatedly transmitted false representations as part of an ongoing enterprise to promote Sofia University's financial progress to the detriment of ITU.

117.    This pattern of wire fraud led to an increase in O'Brien's, Ryan's, and Does 1-10s' control over Sofia University.

118.    O'Brien, Ryan, and Does 1-10 promoted Sofia University's affairs through their pattern of wire fraud.

119.    ITU has been significantly damaged by O'Brien's, Ryan's, and Does 1-10s' pattern of wire fraud.

120.    The Court should award to ITU treble damages and the cost of this litigation, including reasonable attorney fees.

## FOURTH CAUSE OF ACTION
### Breach of Contract (Covenant of Good Faith and Fair Dealing)
### (WSCUC)

121.    ITU incorporates all preceding allegations by reference.

122.    Under California law the elements of breach of contract are: (1) the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) the resulting damages to the plaintiff.[2]

123.    The WSCUC Handbook of Accreditation, as well as all associated policies and guidelines promulgated by WSCUC to govern the accreditation relationship, comprise a contract between WSCUC and ITU.[3]

124.    Every contract includes an inherent covenant of good faith and fair dealing, which obligates each party to the contract to not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

125.    WSCUC breached the covenant of good faith and fair dealing by at least the following actions:

        a.    Pressuring ITU to remove Yau-Gene Chan and install O'Brien as CEO in February 2015.

---

[2] *Kumaraperu v. Feldsted*, 237 Cal. App. 4th 60, 70, 187 Cal. Rptr. 3d 583, 591 (2015)

[3] *Dannhausen v. Business Publications Audit of Circulation, Inc.,* 797 F.2d 548, 552 (7th Cir. Ill. 1986) ("Association by-laws are in the nature of contracts among associations and members, and conduct that violates by-laws is akin to a breach of contract."); *Koefoot v. American College of Surgeons,* 692 F. Supp. 843, 860 (N.D. Ill. 1988) ("[M]embers of voluntary associations and the associations themselves are contractually bound to follow the bylaws, rules, and regulations of the association. By joining the association, a member accepts this obligation as a condition of membership. By accepting the member into the association, the association accepts this obligation as a limitation on its ability to impair the member's status."); *Career Care Inst., Inc. v. Accrediting Bureau of Health Educ. Schs., Inc.,* 2009 U.S. Dist LEXIS 45784 (E.D. Va. Mar. 24, 2009) (holding that state law claims, like breach of contract, are not preempted by the Higher Education Act.

COMPLAINT; DEMAND FOR JURY TRIAL

b. Allowing Barry Ryan and Richard Winn to make conflicted decisions about ITU accreditation and to be in positions of unfair and unwarranted advantage and privilege at ITU.

c. Allowing Barry Ryan to simultaneously hold the position of Provost at ITU and commissioner at WSCUC.

d. Allowing O'Brien and others to conspire to injure ITU (i.e., luring students and potential students from ITU to Sofia University and/or other competing institutions, using ITU confidential information and trade secrets to develop competing programs and obtain accreditation at Sofia University and/or other institutions)

126. WSCUC is liable to ITU for at all damages to ITU, including but not limited lost money, lost revenue, lost employees and staff, diminished ability to function as a university, and lost goodwill reputation as a result of WSCUC's breach.

## FIFTH CAUSE OF ACTION
### Violation of Conflict-of-Interest Policy
### (WSCUC)

127. ITU incorporates all preceding allegations by reference.

128. In WSCUC's Handbook of Accreditation ("Handbook"), in Part I labeled, Commission Code of Good Practice and Ethical Conduct, the Handbook states, "The Commission maintains a commitment to: [5] Maintain and implement a conflict-of-interest policy for members of review teams, members of the Commission, and Commission staff to ensure fairness and avoid bias."

129. Despite WSCUC's written commitment to avoid any conflicts of interest, there have been numerous conflicts of interest regarding WSCUC and ITU. Greg O'Brien, who had significant ties to WSCUC, was installed and protected as President of ITU. O'Brien as seen on his LinkedIn account was a volunteer at WSCUC from 2004-2014. O'Brien was also the chair of Sofia University until at least July 2015. O'Brien entered a contract to be the consultant for accreditation for WSCUC

for ITU, Sofia, and California Northstate University ("CNU") in 2007. Sofia and CNU are competitors of ITU. Barry Ryan became Provost at ITU simultaneously or shortly after he was a WSCUC commissioner. Barry Ryan was a commissioner for WSCUC from 2013-2019, and served as Provost and Vice President for Academic Affairs for ITU from 2016-2018.

130.    WSCUC was aware of these conflicts of interest but notwithstanding allowed them to happen and continue.

131.    As described herein, these conflicts of interest resulted in severe mismanagement of ITU under O'Brien's regime, including but not limited to significant enrollment declines, depletion of financial reserves, general financial mismanagement, and loss of goodwill and reputation.

132.    WSCUC is liable to ITU for at all damages to ITU, including but not limited to lost money, lost revenue, lost employees and staff, diminished ability to function as a university, and lost goodwill and reputation as a result of WSCUC's breach.

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty and Duty of Loyalty
### (O'Brien, Ryan, Does 1-10)

133.    ITU incorporates all preceding allegations by reference.

134.    As a consultant to and President of ITU, O'Brien had fiduciary duties and duties of loyalty to ITU.

135.    Instead, O'Brien held high-level positions simultaneously at ITU (President) and a direct competitor, Sofia University (chairman).

136.    It was impossible for O'Brien to devote sufficient attention to ITU while holding a President/CEO position at a competing university.

137.    O'Brien used confidential information from ITU, including but not limited to ITU Trade Secrets and information on developing, managing, and offering degree programs, to develop

competing degree programs at Sofia University, which Sofia University then used to compete with ITU.

138.    O'Brien acted to intentionally lure students away from ITU and to Sofia University instead.

139.    O'Brien hired his friends and cronies, including Ryan as Provost, for sinecures and positions for which they were conflicted, not qualified, and/or unable/unwilling to devote their full attention and/or efforts.

140.    O'Brien assisted Lam and others in embezzling hundreds of thousands of dollars from ITU through fraudulent IT vendor schemes.

141.    O'Brien lived in Florida while ostensibly acting as CEO of ITU—and did not devote the amount time necessary to the position of CEO of a university.

142.    When O'Brien took over as President of ITU, he failed to adequately address—and essentially ignored—the SEVP issue.

143.    O'Brien's management of this issue resulted in ITU being forced into accepting a painful settlement that further damaged ITU.

144.    O'Brien was conflicted on this issue because any damage to ITU significantly benefitted Sofia University by accelerating ITU's demise and Sofia University's opportunity to take ITU's students and other resources.

145.    O'Brien's actions resulted in ITU being dysfunctional, financially mismanaged, wasting money, and losing enrollment.

146.    O'Brien is liable to ITU for all damages to ITU caused by his breaches of fiduciary duties and duties of loyalty, including but not limited to lost money, lost revenue, lost employees and staff, diminished ability to function as a university, and lost goodwill and reputation as a result of O'Brien's breached.

147.     Ryan was simultaneously a WSCUC commissioner, ITU Provost, and Sofia University President.

148.     As Provost of ITU, Ryan had fiduciary duties and duties of loyalty to ITU.

149.     It was impossible for Ryan to devote sufficient attention to ITU while acting as President at a competing university.

150.     It was impossible for Ryan to be loyal to ITU, and to observe his fiduciary duties to ITU, while acting as President of a competing university.

151.     Ryan used confidential information from ITU, including but not limited to ITU Trade Secrets and information on developing, managing, and offering degree programs, to develop competing degree programs at Sofia University, which Sofia University then used to compete with ITU.

152.     Ryan's actions significantly damaged ITU.

153.     Ryan is liable to ITU for all damages to ITU caused by his breaches of fiduciary duties and duties of loyalty, including but not limited to lost money, lost revenue, lost employees and staff, diminished ability to function as a university, and lost goodwill and reputation as a result of Ryan's breached duties.

154.     Does 1-10 held employment or other positions at ITU and concurrently had associations, obligations, and/or loyalties to Sofia University, which was a competitor to ITU.

155.     It was impossible for Does 1-10 to devote sufficient attention to ITU while having obligations and loyalties to a competing university.

156.     It was impossible for Does 1-10 to be loyal to ITU, and to observe their respective fiduciary duties to ITU, while having obligations and loyalties to a competing university.

157.     Does 1-10 used confidential information from ITU, including but not limited to ITU Trade Secrets and information on developing, managing, and offering degree programs, to develop

competing degree programs at Sofia University, which Sofia University then used to compete with ITU.

158.    The actions of Does 1-10 significantly damaged ITU.

159.    Does 1-10 are liable to ITU for all damages to ITU caused by their respective breaches of fiduciary duties and duties of loyalty, including but not limited to lost money, lost revenue, lost employees and staff, diminished ability to function as a university, and lost goodwill and reputation as a result of O'Brien's breached duties.

## SEVENTH CAUSE OF ACTION
### Fraudulent Inducement
### (O'Brien)

160.    ITU incorporates all preceding allegations by reference.

161.    O'Brien induced ITU to enter into a Severance/Separation Agreement with O'Brien even though O'Brien knew that he had embezzled, breach fiduciary duties, breached duties of loyalty, converted ITU's funds, and assisted others in converting ITU's funds.

162.    As a fiduciary of ITU, O'Brien had a duty to make material disclosure to the ITU Board relating to claims that he knew of that ITU had against O'Brien.

163.    Instead, O'Brien used his influence to convince the ITU Board that ITU needed to pay O'Brien $90,000 for a release of claims!

164.    O'Brien is liable for all damages resulting from this fraudulent inducement, including but not limited to the $90,000 severance payment.

165.    Additionally, the Court should declare that the Severance/Separation Agreement is void and unenforceable.

## EIGHTH CAUSE OF ACTION
### Conversion
### (Greg O'Brien, Does 1-10)

166.     ITU incorporates all preceding allegations by reference.

167.     O'Brien and Does 1-10 diverted ITU funds and information for their own use, including but not limited to for use in promoting Sofia University.

168.     O'Brien and Does 1-10 assisted several ITU insiders in embezzling funds from ITU for their personal benefit.

169.     O'Brien and Does 1-10 converted these funds.

170.     O'Brien and Does 1-10 is liable to ITU for all damage to ITU resulting from this conversion.


## NINTH CAUSE OF ACTION
### Breach of Employment Contract
### (O'Brien)

171.     ITU incorporates all preceding allegations by reference.

172.     O'Brien was paid $360,000 per year for work he did not do. Instead of running a university, O'Brien lived in Florida, hired others to run ITU in his absence, and periodically visited ITU.

173.     Additionally, while acting and being paid as President of ITU, O'Brien was chairman of the board at competing Sofia University.

174.     O'Brien intentionally and willfully fell far short of providing the President/leadership services he was paid $360,000/year to provide to ITU.

175.     O'Brien is liable for all salary and benefits received from ITU. Benefits include but are not limited to the living accommodation and vehicle(s) that ITU provided to O'Brien.

## NINTH CAUSE OF ACTION
### Breach of Employment Contract
### (Ryan)

176.     ITU incorporates all preceding allegations by reference.

177.     Ryan was paid $250,000 per year to be Provost for ITU—work he did not do.

178.    Instead of spending time being a Provost for ITU, Ryan was simultaneously President of a competing university (Sofia University) and was assisting Sofia University in plundering ITU and misappropriating ITU's Trade Secrets.

179.    Ryan intentionally and willfully fell far short of providing the Provost services he was paid $250,000/year to provide to ITU.

180.    Ryan is liable for all salary and benefits received from ITU. Benefits include but are not limited to the living accommodation and/or vehicle(s) that ITU provided to Ryan.

## PRAYER FOR RELIEF

WHEREFORE, ITU prays for judgment and relief against WSCUC, Sofia University, O'Brien, and Ryan as follows:

a.    For all damages, including general, specific, special, and punitive, resulting from WSCUC's, Sofia University's, O'Brien's, and Ryan's wrongful acts, in an amount to be determined at trial;

b.    For attorney fees and costs incurred herein as authorized by contract and statute;

c.    For double and/or treble damages as authorized by statute;

d.    For pre- and post-judgment interest at the statutory rate; and

e.    For such further relief as the Court deems just and equitable.

DATED:  August 8, 2022

STRONG & HANNI

By:    Joseph Shapiro

Joseph Shapiro
*Attorneys for Plaintiff*

## REQUEST FOR JURY TRIAL

Plaintiffs hereby requests a jury trial.

DATED:  August 8, 2022                    STRONG & HANNI

By:

Joseph Shapiro
*Attorneys for Plaintiff*
*International Technological University Foundation*